******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MILES JOHNSON (SC 20878)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

## *Syllabus*

Convicted of murder, burglary in the first degree, conspiracy to commit burglary in the first degree, and tampering with physical evidence, the defendant appealed to this court. Shortly after the discovery of the decomposed body of the victim, with whom the defendant previously had an intimate relationship, the police conducted a series of three interviews with the defendant. Prior to the second interview, the police read the defendant his rights under *Miranda* v. *Arizona* (384 U.S. 436), and the defendant agreed to waive those rights. Thereafter, during that interview, the defendant made certain incriminating statements after which he told the police that he was "done talking . . . ." At that point, the interview ended, and the defendant was placed under arrest. The next morning, while the defendant was awaiting transport to court for his arraignment, he indicated to B, a detective, his desire to speak again. During this third interview, in response to the defendant's equivocal request for counsel, B advised the defendant of his *Miranda* rights, and the defendant again agreed to a waiver of those rights. During this third interview, the defendant admitted to killing the victim. The trial court denied the defendant's pretrial motion to suppress his statements from the third interview, in which he claimed that B had not clarified his equivocal invocation of his right to counsel, in violation of the state constitution, as articulated in *State* v. *Purcell* (331 Conn. 318). On appeal, the defendant claimed, inter alia, that the trial court had improperly denied his motion to suppress. *Held*:

The defendant could not prevail on his unpreserved claim that the trial court had improperly admitted into evidence the video recording of his second interview with the police on the ground that he did not validly waive his *Miranda* rights prior to making incriminating statements during that interview, as defense counsel affirmatively waived the defendant's *Miranda*-based claim at trial.

Defense counsel waived any *Miranda*-based claims arising from the second interview, insofar as he challenged only the admission of statements made during the third interview in the motion to suppress, and it was apparent that defense counsel made an affirmative decision not to challenge at trial the statements made during the second interview on the ground that the admission of those statements violated the defendant's *Miranda* rights.

There was no merit to the defendant's claim that the trial court had improperly admitted into evidence the video recording of the third interview with B on the ground that B had failed to clarify the defendant's equivocal request for

counsel, in violation of his rights under the state constitution, as articulated in *Purcell*.

Given that the defendant initiated the third interview after previously invoking his *Miranda* rights just hours beforehand and that the defendant then made an equivocal invocation of his right to counsel, B's provision of *Miranda* warnings at that point was a reasonable and sufficient response, as B sought to ensure that the defendant understood all of his rights, including the right to counsel, before any interrogation commenced.

Moreover, the defendant's express waiver of his *Miranda* rights, following B's advisement of those rights, for a second time, within less than twelve hours between the second and third interviews, manifested the defendant's clear and unequivocal desire to proceed with the third interview without counsel, and, under the circumstances, that readvisement sufficiently clarified the defendant's equivocal request for counsel.

Furthermore, there was no merit to the defendant's claim that certain unprompted comments that B made after the defendant's waiver of his *Miranda* rights during the third interview constituted an impermissible attempt to persuade the defendant to waive his rights in order to continue with that interview, as B merely attempted to explain that, as a practical matter, it was improbable that the defendant could obtain an attorney to be present for questioning at the police station prior to his arraignment, which was scheduled for that same morning.

The trial court properly denied the defendant's motion to suppress his cell phone records and all of the evidence derived therefrom, including location data, as the warrant authorizing the search and seizure of the defendant's cell phone satisfied the constitutional requirements of probable cause and particularity.

The warrant was supported by probable cause, as the facts contained in the affidavit in support of that warrant, together with the reasonable inferences that could be drawn therefrom, established a fair probability that the defendant had been involved in the victim's murder.

Moreover, the warrant satisfied the particularity requirement insofar as it sought a list of specific records, over a relevant time period, that was sufficiently limited and connected to the factual circumstances surrounding the victim's murder.

Contrary to the defendant's claim, the warrant did not authorize an impermissible general search of all of his cell phone records in view of the warrant's use of the phrase "including, but not limited to," as the warrant authorized a search of only the defendant's cell phone records that were in the possession of his cell phone carrier and that were created within a limited time period.

(*Three justices dissenting in part in one opinion*)

Argued September 24, 2025—officially released February 3, 2026

*Procedural History*

Substitute information charging the defendant with the crimes of murder, burglary in the first degree, conspiracy to commit burglary in the first degree, tampering with physical evidence, and conspiracy to commit tampering with physical evidence, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Preleski, J.*; verdict of guilty; thereafter, the court, *Preleski, J.*, vacated the conviction of conspiracy to commit tampering with physical evidence and rendered judgment of conviction of murder, burglary in the first degree, conspiracy to commit burglary in the first degree, and tampering with physical evidence, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*Meryl R. Gersz*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Don Therkildsen*, supervisory assistant state's attorney, and *Alexandra Arroyo*, assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. Following a trial, a jury found the defendant, Miles Johnson, guilty of murder in violation of General Statutes §§ 53a-54a (a) and 53a-8, burglary in the first degree in violation of General Statutes § 53a-101 (a) (3) and § 53a-8, conspiracy to commit burglary in the first degree in violation of § 53a-101 (a) (3) and General Statutes § 53a-48, tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1) and § 53a-8, and conspiracy to commit tampering with physical evidence in violation of §§ 53a-155 (a) (1) and 53a-48. The trial court rendered judgment of conviction and imposed a total effective sentence of fifty-five years of incarceration.[1]

---

[1] At sentencing, the trial court vacated the defendant's conviction for conspiracy to commit tampering with physical evidence under *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013).

The defendant appeals from the judgment of conviction directly to this court pursuant to General Statutes § 51-199 (b) (3). On appeal, the defendant claims that the trial court improperly **(1)** admitted into evidence the video recording of his September 23, 2020 police interview (September 23 interview) because the waiver of his *Miranda*[2] rights was invalid, **(2)** denied his motion to suppress all evidence, including the video recording, of the statements he made during his September 24, 2020 police interview (September 24 interview) because the police had failed to clarify his equivocal request for counsel, in violation of his state constitutional rights under *State* v. *Purcell*, 331 Conn. 318, 203 A.3d 542 (2019), and **(3)** denied his motion to suppress his cell phone records and all evidence derived therefrom because the search warrant to obtain that evidence was not supported by probable cause and lacked particularity.[3] We reject each of the defendant's claims and therefore affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and the victim, Lerato Rahaba Rachel Sebetlela, had an on-and-off sexual relationship that began sometime in 2018. In early 2020, both the defendant's girlfriend, Casandra Nazario, and the victim's boyfriend, Galani Modongo, learned about an ongoing affair between the defendant and the victim.

---

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The defendant raises two additional claims. First, the defendant claims that the trial court erred by failing to disclose potential impeachment or exculpatory materials to the defendant in accordance with *Giglio* v. *United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and asks that we review certain sealed personnel records to determine if there is any information that constitutes exculpatory and/or impeachment evidence that would affect his constitutional rights to confrontation, to due process, and to present a defense. Second, the defendant claims that the trial court deprived him of his constitutional right to due process because its jury instructions on the burglary charge improperly invaded the province of the jury. We have reviewed both claims, as well as the sealed documents, and we discern no error on the part of the trial court.

On the morning of July 10, 2020, Modongo sent a message using Facebook Messenger to Nazario to inform her that he had evidence that the defendant was still involved with the victim. After Modongo provided her with the evidence, Nazario confronted the defendant about the affair, and, although he initially denied it, the defendant eventually admitted that he and the victim had been having sex. At that point, the defendant told Nazario that the victim "need[ed] to die." Nazario and the defendant prepared a plan to kill the victim, which included buying supplies to kill her and to clean up the crime scene afterward.

Late at night, on July 10, 2020, the defendant and Nazario drove to the victim's apartment to carry out their plan. While Nazario waited downstairs, the defendant went upstairs into the victim's apartment and stabbed the victim until she was close to death. Ten to fifteen minutes later, Nazario entered the apartment and further stabbed the victim. Once the victim was dead, the defendant and Nazario proceeded to tape the victim's arms and legs together, to wrap her body in a blanket, and to cover her body in garbage bags. They then cleaned up the blood from the floor and the kitchen cabinets. After that, they staged the apartment to make it appear as though the victim had left in a hurry.

The defendant and Nazario put the victim's body into the trunk of the defendant's vehicle and drove to Black Rock State Park in Watertown. When they arrived, the gate to the park was closed. This prompted the defendant to drive a little farther, before pulling over on the side of Route 6. The defendant and Nazario then took the victim's body out of the trunk and pushed it under the guardrail so that it rolled down the hill into a wooded area. The pair then returned to the defendant's house, where they burned evidence of the killing in a firepit.

Two months later, on September 12, 2020, the state police recovered the victim's dead body wrapped in a quilt, duct tape, and black garbage bags. Shortly thereafter, Steven Brownell, a detective with the Waterbury

Police Department, obtained the victim's cell phone records, which revealed that the last communication on the her cell phone was a phone call originating from the defendant's cell phone. Brownell interviewed the defendant on three separate occasions: September 18, 23 and 24, 2020. After the defendant made inculpatory statements during the September 23 interview, Brownell arrested him for the murder of the victim. Additional facts and procedural history will be set forth as necessary.

## I

We first address the defendant's challenge to the September 23 interview. The defendant claims that the trial court improperly admitted into evidence the video recording of his September 23 interview, in violation of his rights under the fifth and fourteenth amendments to the United States constitution. The defendant argues that the video recording was improperly admitted into evidence because he was in police custody and did not validly waive his rights prior to making incriminating statements in response to police interrogation. Specifically, he contends that his waiver was neither knowing and intelligent nor voluntary, as required under *Miranda* v. *Arizona*, 384 U.S. 436, 444, 474–76, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant acknowledges that he did not object to the admission of this video recording at trial and thus concedes that this claim is unpreserved. He therefore seeks review of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). The state argues, inter alia, that the defendant cannot satisfy the third prong of *Golding*, the existence of a constitutional violation, because defense counsel affirmatively waived the defendant's *Miranda* claim at trial. We agree with the state's argument that the defendant has waived his constitutional claim and, therefore, conclude that his claim fails under *Golding*'s third prong.

The following additional facts are relevant to our analysis. After being contacted by the police, the defendant

agreed to go to the police station on September 18, 2020, to be interviewed (September 18 interview). During the September 18 interview, the defendant provided a written statement, in which he acknowledged, among other things, that he had a sexual relationship with the victim, called the victim around midnight on July 11, 2020, and spoke to Modongo over the phone several days later. After the September 18 interview, the police obtained a search warrant for the defendant's cell phone records. The records they received included location data that showed that the defendant was near the victim's apartment and Black Rock State Park during the night of July 10, 2020, and into the early morning hours of July 11, 2020.

On September 23, 2020, when they received the defendant's cell phone records, Brownell and other members of the Waterbury Police Department went to the defendant's residence and asked him if he would come back to the station house for an interview. After the defendant agreed, the officers brought him to an interview room at the station house, and the September 23 interview commenced at about 9:42 p.m. At the outset, Brownell read the defendant his *Miranda* rights, and the defendant executed a written waiver of those rights. During the course of the September 23 interview, the defendant made incriminating statements, including an admission that he drove with Nazario to a wooded area that may have been Black Rock State Park. After making those admissions, the defendant said he was "done talking," and Brownell ended the September 23 interview. Brownell then arrested the defendant and placed him in custody. The September 23 interview concluded at approximately 2:03 a.m., on September 24, 2020.

Later in the morning on September 24, 2020, at approximately 8 a.m., when Brownell arrived at the police station for work, the defendant was awaiting transport to court. When he saw Brownell, the defendant indicated a desire to speak to him again. As a result, Brownell

interviewed him for a third time. During the September 24 interview, the defendant admitted to killing the victim.

Prior to trial, the defendant moved to suppress only the September 24 interview statements on the ground that the police had not clarified his equivocal invocation of the *Miranda* right to counsel, as required by this court's decision in *State* v. *Purcell*, supra, 331 Conn. 362. At the hearing on the motion to suppress, defense counsel acknowledged that there were three interviews and that the only one at issue was the September 24 interview.

During his testimony at the suppression hearing, Brownell described the process of the investigation and the defendant's arrest. As part of this description, Brownell testified about the September 23 interview as background to the September 24 interview that was the subject of the defendant's motion to suppress. When the prosecutor later offered into evidence the advisement card that the defendant had signed on September 23, 2020, acknowledging that he was waiving his *Miranda* rights, defense counsel objected that it was "not relevant to the issue that our motion raises," which he previously explained was "the requirements of the police when a suspect makes an equivocal request for an attorney." The trial court overruled the objection.

Shortly thereafter, the prosecutor sought to admit portions of the September 23 interview video recording showing that the defendant had received *Miranda* warnings and that he had also invoked his rights at the end of the interview. Defense counsel again objected on the ground of relevance, claiming, as he argued earlier, that those portions of the September 23 interview had no relevance to the legal issue that the court had to decide, namely, whether, during the September 24 interview, the police properly addressed the defendant's equivocal request for counsel. The trial court overruled that objection. After the evidentiary portion of the hearing had concluded, the arguments of counsel focused solely on the suppression of the statements from the September

24 interview. The trial court denied the defendant's motion to suppress in a memorandum of decision that also described the September 23 interview and in which the court concluded that the defendant's *Miranda* waiver at that interview was knowing and voluntary.

At trial, the prosecutor introduced the video recordings of the September 23 and 24 interviews into evidence. The prosecutor offered the video recording of the September 23 interview into evidence as a state exhibit during Brownell's testimony. At that time, defense counsel objected to "the showing of the statements made by . . . Brownell." In making this objection, defense counsel stated: "I understand [that] *the statements from* [*the defendant*] *would be admissible*, but my objection [is] to statements made by [Brownell] as, you know, not being relevant, prejudicial." (Emphasis added.) Following a sidebar, the trial court overruled defense counsel's objection but instructed the jury that only the defendant's statements were to be considered as evidence. The video recording of the September 23 interview was then played for the jury, but a brief recess took place before the video ended. During this recess, the trial court confirmed with the parties that "the objection was overruled with respect to the admissibility" and that neither the prosecutor nor defense counsel had "any comment with respect to the instruction that the court gave . . . ." Defense counsel stated: "No. I was fine with that instruction." The remainder of the video recording of the September 23 interview was then played for the jury, followed by the video recording of the September 24 interview, with the same instruction given to the jury.

It is undisputed that the defense did not raise a *Miranda*-based challenge to the admission of the video recording of the September 23 interview prior to or at trial, and, therefore, the defendant seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, supra, 317 Conn. 781. "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the

following conditions are met: **(1)** the record is adequate to review the alleged claim of error; **(2)** the claim is of constitutional magnitude alleging the violation of a fundamental right; **(3)** the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and **(4)** if subject to harmless error analysis, the state has failed to demonstrate [the] harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two prongs govern whether we may review the claim, [whereas] the second two control whether the defendant may prevail on his claim because there was constitutional error that requires a new trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Johnson*, 345 Conn. 174, 189, 283 A.3d 477 (2022); see *State* v. *Golding*, supra, 239–40; see also *In re Yasiel R.*, supra, 781 (modifying third prong of *Golding*). "In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." *State* v. *Golding*, supra, 240; see, e.g., *State* v. *Santana*, 313 Conn. 461, 469–70, 97 A.3d 963 (2014).

"A waived claim, as opposed to an unpreserved claim, does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court. . . .

"It is well settled that a criminal defendant may waive rights guaranteed to him under the constitution. . . . The mechanism by which a right may be waived, however, varies according to the right at stake. . . . For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver

may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." (Citations omitted; internal quotation marks omitted.) *State* v. *Hinton*, 352 Conn. 183, 202–203, 336 A.3d 62 (2025); see, e.g., *State* v. *Iverson*, 352 Conn. 422, 436, 336 A.3d 1212 (2025); *State* v. *Culbreath*, 340 Conn. 167, 179, 263 A.3d 350 (2021); *State* v. *Holness*, 289 Conn. 535, 543–44, 958 A.2d 754 (2008). "We employ plenary review to determine whether defense counsel had waived this claim before the trial court." *State* v. *Hinton*, supra, 204.

"The decision to admit or exclude evidence on constitutional, statutory, or evidentiary grounds is the type of tactical trial decision that appropriately may be waived by counsel acting alone . . . ."[4] (Internal quotation marks omitted.) *State* v. *Culbreath*, supra, 340 Conn. 180. For example, "[t]his state's appellate courts have held that defense counsel's indication that he or she had no objection to the admission of an exhibit at trial constituted a waiver of the defendant's confrontation rights and failed to satisfy *Golding*'s third prong." *State* v. *Hinton*, supra, 352 Conn. 203. *Miranda* related rights are among the constitutional rights that may be waived by counsel at trial. See, e.g., *State* v. *Culbreath*, supra, 182; *State* v. *Boyd*, 295 Conn. 707, 750 and n.26, 992 A.2d 1071 (2010), cert. denied, 562 U.S. 1224, 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011).

The defendant contends that the lack of a timely motion to suppress the September 23 interview was a failure of preservation, but not a waiver, when viewed in context.

---

[4] "To be effective . . . defense counsel's waiver must be knowing and intelligent. . . . This requirement ordinarily is met easily because it is presumed that, in our adversary system, counsel was familiar with the relevant constitutional principles and had acted competently in determining that . . . the defendant's [constitutional] rights were protected. . . . Consequently, to demonstrate knowing and intelligent waiver, the state ordinarily is not required to establish that defense counsel was aware of a possible constitutional claim in the factual scenario presented . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Culbreath*, supra, 340 Conn. 181.

The defendant further argues that "defense counsel's statement [at trial] that the [defendant's September 23 interview statements were] *admissible* is taken out of context" by the state, as "defense counsel was simply explaining that his objection concerned [Brownell's] statements," rendering it "not a waiver." **(Emphasis added.)** We agree with the defendant that we must consider the full context of defense counsel's statements in assessing whether a waiver of the *Miranda* claim occurred. See, e.g., *State* v. *Iverson*, supra, 352 Conn. 436–37.

After reviewing the entire context of counsel's statements, we conclude that defense counsel's actions waived *Miranda* claims arising from the September 23 interview. Specifically, defense counsel challenged only the September 24 interview in the motion to suppress. Defense counsel, moreover, presumably was aware of potential *Miranda* issues relating to the September 23 interview, which figured prominently in the litigation of the motion to suppress the September 24 interview. In fact, defense counsel repeatedly objected to evidence of the defendant's purported *Miranda* waiver being admitted at the suppression hearing on the ground that it was not relevant to the motion to suppress. In doing so, defense counsel "attempted to narrow" the scope of the suppression hearing to evidence of the September 24 interview and actively discouraged the consideration of any potential *Miranda* issues relating to the September 23 interview.[5] Ultimately, the trial court's memorandum of decision on the motion to suppress expressly discussed the September 23 interview and found that

---

[5] During the suppression hearing, defense counsel explained that he "attempted to narrow [the] hearing with relevance objections regarding a lot that the state had introduced outside of . . . [t]he short part [of the September 24 interview] where there was an equivocal invocation made [by the defendant], and [Brownell] responded." Defense counsel's strategy was based on his belief that only "that part of the conversation . . . really mattered" insofar as it was the only part that was relevant to his claim that the police failed to properly address the defendant's equivocal request for counsel. Defense counsel asserted that "the knowingness and the voluntariness of a *Miranda* waiver [were] not in that claim."

"the defendant had a full understanding of his rights" during that interview and that he waived them knowingly and voluntarily. The defendant did not file a motion or otherwise challenge those findings.

Defense counsel never objected to the admission at trial of the statements that the defendant made during the September 23 interview. Indeed, at trial, defense counsel conceded that the defendant's statements during the September 23 interview were "admissible," distinguishing them from Brownell's comments during that interview, to which he objected. Given this full context, and the presumption that "counsel was familiar with the relevant constitutional principles and had acted competently in determining that . . . the defendant's [constitutional] rights were protected"; (internal quotation marks omitted) *State* v. *Culbreath*, supra, 340 Conn. 181; it is apparent that defense counsel made an affirmative decision not to challenge the September 23 statements at trial on *Miranda* grounds. See, e.g., *State* v. *Iverson*, supra, 352 Conn. 433–37 (concluding that defense counsel's anticipation of medical examiner's testimony in connection with his objection to graphic crime scene photographs indicated that his failure to raise confrontation clause objection to medical examiner testimony and autopsy report was "strategic" in nature, thus waiving confrontation claim under third prong of *Golding*). We therefore conclude that the defendant has waived any *Miranda* claim arising from the September 23 interview, rendering relief unavailable under the third prong of *Golding*.

## II

Next, the defendant claims that the trial court improperly admitted into evidence the video recording of the September 24 interview. Specifically, he asserts that the trial court should have granted his motion to suppress all testimony and evidence related to the September 24

interview because Brownell failed to stop the interview and to clarify the defendant's equivocal request for counsel before interrogating him, as required under article first, §8, of the Connecticut constitution and this court's decision in *State* v. *Purcell*, supra, 331 Conn. 362. We are not persuaded.

The following additional facts and procedural history are relevant to our analysis. After the September 23 interview ended, the defendant was arrested and taken into custody in the early morning hours of September 24, 2020. The defendant's arraignment was scheduled for later that morning. Accordingly, when Brownell returned to work around 8 a.m., the defendant was in the holding area of the detective bureau at the Waterbury Police Department, awaiting transport to court for his arraignment.

Upon seeing Brownell enter the detective bureau, the defendant motioned for Brownell to come over and to speak with him. When Brownell opened the door to the holding area, the defendant asked, "what's going on?" Brownell explained that the defendant would soon be transported to court. The defendant then expressed his desire to speak further with Brownell. In response to this request, Brownell brought the defendant to a nearby interview room.

Almost immediately upon entering the interview room, the defendant asked: "I can't have a lawyer present, right?" Apparently unable to hear the defendant's question, Brownell responded, "[h]uh?" The defendant then repeated, "[c]an I have a lawyer present, or no?" Brownell responded, "[i]f you wanted a lawyer right now, it's going to happen when you go over to court, is what it boils down to, okay?" Brownell then said, "[w]hen I came in, I saw you in the holding room there, and you said that you wanted to talk about something . . . ." The defendant responded, "[n]o, I was just asking." Brownell continued: "[T]o be crystal clear, when we ended last night, you said

that you were done talking, okay? . . . And, this morning, you said that there was something that you wanted to talk about . . . is that fair?" The defendant responded, "[t]hat's fair, yeah."

Then, before beginning the interrogation, Brownell advised the defendant of his *Miranda* rights. Specifically, Brownell provided the defendant with an "advisement of rights card," and he clearly read the rights aloud: "You have the right to remain silent. If you talk to any police officer, anything you say can and will be used against you in court. You have the right to consult an attorney before you are questioned, and you may have him or her with you during questioning. If you cannot afford a lawyer, one will be appointed to you, if you wish, before any questioning. If you wish to answer questions, you can stop answering at any time. You may stop answering at any time if you wish to talk to an attorney, [and] you may have him or her with you during any questioning." The defendant read his rights written on the advisement card and circled "[y]es" in response to the questions of "[d]o you understand these rights" and "[d]o you wish to give up these rights and answer my questions?" The defendant signed and dated the advisement card, and initialed beside every applicable right and question.

After the defendant signed and initialed the waiver of rights and prior to asking him any questions, Brownell asked, "[d]o you understand those? I know you mentioned having an attorney when we first got here. Okay. That's something that would happen over at court. So, if you are not comfortable talking to me right now without the attorney, that's your choice. I understand that. But . . . you said you wanted to talk about something, okay?" Over the course of the nearly fifty minute interview that followed, the defendant admitted to killing the victim, disposing of her body, and destroying the evidence.

The defendant filed a motion to suppress the video evidence, in addition to other potential evidence, of the

statements he made during the September 24 interview on the ground that Brownell had failed to clarify the defendant's equivocal request for counsel, as required by *State* v. *Purcell*, supra, 331 Conn. 362. The prosecutor conceded that the defendant was in custody and that the defendant's request was equivocal. After a hearing, the trial court denied the defendant's motion, concluding that Brownell had satisfied *Purcell* "because, after [the defendant's] equivocal invocation [of his right to counsel] . . . Brownell conducted no further questioning of the defendant [and] advised the defendant of his rights in a clear, unambiguous fashion, and the defendant expressed, in writing, his desire to waive his rights and [to] continue to speak to . . . Brownell."

On appeal, the defendant claims that the trial court improperly denied his motion to suppress evidence regarding the statements he made during the September 24 interview. Specifically, the defendant asserts that Brownell's actions did not comply with *Purcell* because Brownell failed to ask clarifying questions once the defendant made his equivocal request for counsel and merely readministered the *Miranda* warnings, which was not an acceptable response under the circumstances. We disagree.

We begin with the applicable standard of review. "[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] . . . our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are

legally and logically correct and whether they find support in the facts [found by the trial court] . . . .” (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 394, 40 A.3d 290 (2012).

In *State* v. *Purcell*, supra, 331 Conn. 361–62, “we determined that the federal constitutional standard set forth in *Davis* v. *United States*, [512 U.S. 452, 459–60, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)], requiring a suspect’s invocation of the right to counsel to be clear and unequivocal, does not adequately safeguard *Miranda*’s right to the advice of counsel during a custodial interrogation. . . . We therefore adopted a more protective standard under article first, §8, of the Connecticut constitution, which requires questioning to cease after the advisement of *Miranda* rights if a suspect makes an equivocal statement that arguably can be construed as a request for counsel . . . . *Purcell* states that questioning may not resume once a defendant expresses such a request, except for narrow questions designed to clarify the earlier statement and the suspect’s desire for counsel. . . . Alternatively, [i]nterrogators confronted with such a situation . . . may inform the defendant that they understand his statement(s) to mean that he does not wish to speak with them without counsel present and that they will terminate the interrogation. . . . In either scenario, questioning may not resume until the defendant thereafter clearly and unequivocally expresses a desire to continue without counsel present . . . .” (Citations omitted; internal quotation marks omitted.) *State* v. *Culbreath*, supra, 340 Conn. 185–86.

Our decision in *State* v. *Culbreath*, supra, 340 Conn. 167, provides helpful guidance in deciding the claim before us. In that case, we addressed two equivocal requests for counsel;[6] the first request was properly addressed by the police and the second was not. See id., 186–91. With respect to the first request, before the

---

[6] This court assumed, without deciding, that the first request for counsel was an equivocal request for counsel. See, e.g., *State* v. *Culbreath*, supra, 340 Conn. 187.

start of his interview with the police, the defendant asked about the waiver form and what it meant to waive the right to have an attorney present. See id., 186–87. A detective then explained the *Miranda* rights to the defendant, and the defendant signed the waiver form. Id., 187. We concluded that the detective "complied with the dictates of *Purcell* by seeking clarification from the defendant before beginning the interview . . . [and that] [t]he defendant's express waiver of his *Miranda* rights following [the detective's] explanation manifested the defendant's clear and unequivocal desire to proceed with the interview without the presence of counsel." Id.

Similar to the circumstances in *Culbreath*, during the September 24 interview, after the defendant in the present case made his equivocal request for counsel and before beginning the interrogation, Brownell appropriately sought clarification by rereading the defendant his *Miranda* rights. Importantly, just hours before, during the September 23 interview, Brownell had advised the defendant of his *Miranda* rights, and that interview ended when the defendant invoked his rights.[7] Given that the defendant initiated the September 24 interview after previously invoking his *Miranda* rights and then immediately made an equivocal invocation of his right to counsel, Brownell's provision of *Miranda* warnings was a reasonable and sufficient response. This is because, by providing the defendant with *Miranda* warnings, Brownell sought to ensure that the defendant understood all of his rights, including the right to counsel, before any interrogation commenced. Of course, the best response to the defendant's question would have been to simply answer, "yes, you may have counsel present during questioning." That, however, is precisely what

---

[7] The September 23 interview ended with the following colloquy:
  "[The Defendant]: Since I'm being arrested, sir, I doubt if an attorney makes any sense, but—
  "[Brownell]: Okay. You are all done talking about it?
  "[The Defendant]: I'm done talking, sir. Because I'm being arrested, sir."

Brownell did convey to the defendant by readministering the *Miranda* warnings in their totality.

By providing the *Miranda* warnings, Brownell specifically clarified the defendant's right to counsel. Brownell advised the defendant that he had "the right to consult [with] an attorney before [being] questioned," to "have [an attorney] with [him] during questioning," and to "stop answering at any time," including for the purpose of talking to an attorney. The defendant acknowledged that he understood the right to counsel by writing his initials next to that right on the advisement card. The defendant then expressly waived his *Miranda* rights in writing. Therefore, we conclude that the defendant's express waiver of his *Miranda* rights, following Brownell's advisement of those rights, for a second time, within less than twelve hours, manifested the defendant's clear and unequivocal desire to proceed with the interview without counsel. See *State* v. *Culbreath*, supra, 340 Conn. 187–88. Under the circumstances of the present case, this readvisement sufficiently clarified the defendant's equivocal request for counsel.[8]

After he waived his *Miranda* rights, the defendant did not make another equivocal request for counsel; nor did he indicate in any fashion that he did not understand his right to have counsel present during questioning. However, without being prompted, Brownell made another attempt to ensure that the defendant was comfortable going forward without an attorney given that the defendant had mentioned counsel before the readvisement and waiver. Brownell stated: "Do you understand those? I know you mentioned having an attorney when we first got here. Okay. That's something that would happen

---

[8] Here, given the fact that the defendant had invoked his right to end police questioning just a few hours before the September 24 interview, and the defendant reinitiated the interview while simultaneously making an equivocal request for counsel, the readvisement of *Miranda* rights, which directly addressed his equivocal request, was appropriate. Although a rereading of the *Miranda* warnings will, in most contexts, constitute an appropriate clarification under *Purcell*, there certainly may be other circumstances in which it is not.

over at court. So, if you are not comfortable talking to me right now without the attorney, that's your choice. I understand that. But . . . you said you wanted to talk about something, okay?"

The defendant asserts that Brownell's comments both before and after the defendant's waiver did not constitute proper clarifications under *Purcell*. In particular, the defendant contends that Brownell's additional commentary constituted an impermissible attempt to persuade the defendant to waive his rights in order to continue with the September 24 interview by suggesting that the defendant could get an attorney only once he went to court and highlighting that it was the defendant who wished to talk. Because Brownell correctly informed the defendant about his right to have counsel present during questioning, and the defendant never indicated that he was unclear about his waiver of that right, we conclude that Brownell's comments did not impact the defendant's clear and unequivocal desire to proceed without a lawyer.

We recognize that Brownell's statements were not perfect explanations of the defendant's right to counsel. Nevertheless, after evaluating Brownell's comments in context, we agree with the trial court that Brownell's responses merely attempted to explain "the practicalities governing the defendant's circumstances and [were] not 'designed to influence the [defendant] not to invoke his rights.' *United States* v. *March*, 999 F.2d 456, 462 (10th Cir.) [cert. denied, 510 U.S. 983, 114 S. Ct. 483, 126 L. Ed. 2d 434 (1993)]."

Those practicalities were that the defendant had initiated the September 24 interview by indicating a desire to speak to Brownell while he was waiting to be transported to court for his arraignment, where an attorney indeed would be appointed. Given this timing, we understand Brownell's statements to be aimed at explaining the current circumstances to the defendant. Although Brownell failed to address the technical, albeit practically improbable, possibility that the defendant could obtain an attorney to be present for questioning at the

police station prior to his arraignment, the defendant had previously been informed of his right to have an attorney present for any questioning via Brownell's *Miranda* warnings, and he expressly waived that right. Brownell's additional commentary did not undermine the effect of the defendant's waiver of his right to have an attorney present for the September 24 interview. See, e.g., *Duckworth* v. *Eagan*, 492 U.S. 195, 204, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989) ("*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed . . . that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one. . . . If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel." (Citation omitted; footnote omitted.)).

Furthermore, we are not persuaded by the defendant's argument that Brownell's additional commentary was an impermissible "[attempt] to convince the defendant that it was against his [interest] not to continue the interview." *State* v. *Purcell*, supra, 331 Conn. 362. There is a stark contrast between Brownell's statements and comments that are impermissibly aimed at convincing that it is against one's interest not to continue an interview with the police. For example, in *Purcell*, one of the detectives said to the defendant: "[A]fter today, you're never gonna be able to, to give me or any other cop your story. You're gonna let, a judge is gonna look at ya and say, some serious charges against you. You could go to jail for the rest of your life." (Internal quotation marks omitted.) Id., 327. Similarly, in *Culbreath*, a detective told the defendant that, "if he had an attorney present, the attorney 'probably won't let me talk to you,' and 'the cards [will] fall the way they will' without the defendant telling the 'story' of 'the why or the who or the what reason.' " *State* v. *Culbreath*, supra, 340 Conn. 189. These types of comments are aimed at convincing

a defendant that it is against his or her interest not to continue a police interview.

Given the particular circumstances of this case, in which the defendant was about to be transported to court for an arraignment but sought to reinitiate a police interview that he had, just hours before, terminated, Brownell's references to the appointment of an attorney in court and the defendant's desire to talk do not evince any intent to convince the defendant to waive his right to counsel. Rather, Brownell's statements were even more neutral in substance and tone than the detective's permissible response to the first allegedly equivocal request in *Culbreath*. Cf. id., 173, 186–88. In *Culbreath*, before the start of his interview with the defendant, the detective emphasized that "there's a lot of things we need to get through about what happened tonight, but we can't talk unless you agree to talk to us right now." (Internal quotation marks omitted.) Id., 173. We concluded in that case that this statement clarified that the defendant would have to waive his *Miranda* rights in order for the conversation to continue and that his "express waiver of his *Miranda* rights following [that] explanation manifested the defendant's clear and unequivocal desire to proceed with the interview without the presence of counsel." Id., 187. We conclude that Brownell's statement that the defendant would get an attorney in court, "[b]ut . . . you said you wanted to talk about something," is less coercive than the statement we found acceptable in *Culbreath*.

Significantly, here, any potential confusion that Brownell's additional comments may have caused was minimized when Brownell expressly stated, "if you are not comfortable talking to me right now without the attorney, that's your choice. I understand that." Through this statement, Brownell clarified that the defendant need not proceed with the September 24 interview with

out the presence of an attorney and that Brownell would honor the defendant's decision.[9] Brownell's comments could not have been designed to convince the defendant that it was against his interest not to continue the September 24 interview when Brownell very clearly and very directly told the defendant that, if he was not comfortable speaking with him without a lawyer, the interview would stop. And, again, there is no evidence that the defendant made any further request for counsel, equivocal or otherwise, after he wrote his initials and specifically waived his right to have counsel present.

Although a more direct response—the answer "yes"—would have been a preferable response to the defendant's initial inquiry about whether he could have an attorney, we conclude that, under the circumstances of this case, Brownell did not exceed the permissible scope of responses to an equivocal request for counsel. Because he clarified the defendant's equivocal request for counsel by both reissuing the *Miranda* advisement and securing a signed waiver before conducting any further questioning, Brownell complied with *Purcell*. Therefore, the defendant's rights were not violated under article first, §8, of the Connecticut constitution and this court's decision in *State* v. *Purcell*, supra, 331 Conn. 362.

### III

The defendant also claims that the trial court improperly denied his motion to suppress his cell phone records and all evidence derived therefrom, including location data. He contends that the warrant authorizing the

---

[9] Among other related reasons, we implemented *Purcell*'s "stop and clarify rule" to further the purpose of *Miranda* warnings, which is "to show the individual that his interrogators are prepared to recognize his privilege[s] should he choose to exercise [them]." (Internal quotation marks omitted.) *State* v. *Purcell*, supra, 331 Conn. 359–62, quoting *Miranda* v. *Arizona*, supra, 384 U.S. 468. We note that Brownell's statement accords with this purpose. Brownell had also demonstrated just a few hours earlier that he would honor the defendant's request to stop talking if he so chose.

search and seizure of his cell phone records did not comport with the fourth amendment to the United States constitution[10] and article first, § 7, of the Connecticut constitution.

First, the defendant argues that the search warrant was not supported by probable cause because nothing in the accompanying affidavit established a nexus between his cell phone records and the victim's murder. Second, the defendant argues that the warrant lacked particularity because it authorized the search and seizure of the entirety of his cell phone records over a five week period, without establishing how each record was related to the murder investigation. We are not persuaded and, therefore, conclude that the trial court properly denied the defendant's motion to suppress his cell phone records.

The following facts and procedural history are relevant to our analysis. During their investigation, the police sought and obtained a search warrant for the cell phone records relating to the defendant's cell phone number. More specifically, the following information was requested: "T-Mobile telephone records for the number 347-5xx-xxxx including, but not limited to: subscriber information, call detail records with cell site information, [Internet protocol (IP)] addresses for [Voice over Internet Protocol (VoIP)] calls, voice records, data records with cell site information, [short message service (SMS)] detail records, historical [Global Positioning System (GPS)] locations for the time period of 07/10/2020 through the date of 08/14/2020; and any precision location data and [Time Difference of Arrival (TDOA)] or Timing Advance Information when the phone was powered on between 07/10/2020 and 07/20/2020. All cell phone devices

---

[10] The fourth amendment's protection against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

attached to the subscriber/account information related to the phone number of 347-5xx-xxxx."

The search warrant affidavit contained the following factual allegations, among others. An Uber dropped off the victim at her apartment in the early morning hours of July 10, 2020. Three days later, Modongo reported the victim as missing because he had not seen her or heard from her since July 10, 2020. On August 14, 2020, the victim's roommate returned to their apartment and reported that the victim was still missing. Throughout the ensuing investigation, "no family or friends ha[d] seen or heard from [the victim] in any manner," and several of these individuals had reported that the lack of contact with the victim was unusual. On September 12, 2020, decomposed human remains were discovered with "female clothing" and artificial fingernails similar to those that appeared in a photograph of the victim.

In a written statement voluntarily given to the police on September 18, 2020, the defendant explained that he had a relationship with the victim. The defendant also "mentioned that [the victim] called him a few days after [July 11, 2020]," and, during their brief conversation, the victim "sounded upset" and said that "she wanted everyone to leave her alone . . . ." When the police first spoke to the defendant over the phone, he indicated a desire "to file a harassment report [against the victim's] boyfriend," Modongo, for repeatedly calling him to ask where the victim was. Screenshots of WhatsApp messages that were obtained by the police revealed that the defendant texted Modongo that he last spoke to the victim on July 15, 2020.

The search warrant affidavit further provided that the victim's conversation with the defendant "was the last phone conversation [the victim] had on her phone before she was reported missing" on July 13, 2020, and that "[n]o other phone conversation was found in the records provided [in which the defendant] and [the victim] spoke again, like [the defendant] claimed . . . ." The affiants averred that, based on the alleged facts, probable cause

existed to believe that the crime of murder had been committed and that evidence of that offense may be located in the requested records.

Prior to trial, the defendant filed a motion to suppress his cell phone records, and all evidence obtained therefrom, because the warrant **(1)** lacked particularity, **(2)** was overly broad, and **(3)** did not establish probable cause. After a hearing, the trial court denied the defendant's motion. On appeal, the defendant argues that the trial court improperly denied his motion to suppress because the warrant was not supported by probable cause and lacked particularity.

Under both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution, "[p]robable cause to search is established if there is probable cause to believe that (1) . . . the particular items sought to be seized are connected with criminal activity or will assist in a particular . . . conviction . . . and (2) . . . the items sought to be seized will be found in the place to be searched." (Internal quotation marks omitted.) *State* v. *Evans*, 352 Conn. 794, 816–17, 339 A.3d 1138 (2025). "Probable cause requires less than proof by a preponderance of the evidence . . . . The task of the issuing [judge] is simply to make a practical, [commonsense] decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." (Internal quotation marks omitted.) Id., 817. Furthermore, "[g]iven the inextricable connection between people and their cell phones," probable cause for a cell phone's location data exists when the affidavit "establish[es] probable cause that a suspect committed a crime and facts that the suspect is known to use or possess a particular cell phone . . . ." Id., 819.

Next, the particularity requirement is satisfied if the warrant "identifies the place or thing for which there is probable cause to search with sufficient definiteness to preclude indiscriminate searches." (Internal quotation marks omitted.) *State* v. *Smith*, 344 Conn. 229, 249,

278 A.3d 481 (2022). "[T]he particularity requirement has three components. First, a warrant must identify the specific offense for which the police have established probable cause. . . . Second, a warrant must describe the place to be searched. . . . Third, the warrant must specify the items to be seized by their relation to the designated crimes." (Internal quotation marks omitted.) Id.

Whether a warrant satisfies the constitutional requirements of probable cause and particularity presents a question of law over which our review is plenary. See, e.g., *State* v. *Buddhu*, 264 Conn. 449, 459, 467, 825 A.2d 48 (2003), cert. denied, 541 U.S. 1030, 124 S. Ct. 2106, 158 L. Ed. 2d 712 (2004). "In evaluating whether [a] warrant was predicated on probable cause . . . [reviewing] [c]ourts . . . [defer] to the reasonable inferences that the issuing judge could have and did draw . . . and . . . uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the [judge's] conclusion that probable cause existed." (Citations omitted; internal quotation marks omitted.) *State* v. *Evans*, supra, 352 Conn. 817.

With these legal principles in mind, we address whether the warrant for the defendant's cell phone records was constitutionally valid. We first consider the defendant's claim that the warrant was not supported by probable cause. In support of this claim, the defendant asserts that the accompanying affidavit failed to allege sufficient facts to establish a nexus between his cell phone records and the victim's murder. We disagree.

The defendant's argument is based on his view that the only fact connecting him to the victim's murder was that he was the last person to call the victim's cell phone before her disappearance. On the basis of our review of the search warrant affidavit, we conclude that the police averred additional facts, along with the defendant's status as the last caller, that together established a fair probability that evidence relating to the victim's murder would be found in the defendant's cell phone records. In particular, the defendant was involved in a sexual

relationship with the victim and was allegedly the only person who had contact with the victim after she was first reported missing. In addition, his assertion that he spoke to the victim on July 15, 2020, five days after she went missing on July 10, 2020, became highly suspicious when the police discovered that the victim's call records did not show a call with the defendant after July 11, 2020. Given those circumstances, it was reasonable to infer that the defendant was lying about the last time that he had spoken to the victim.

Furthermore, because the defendant reported that the victim "wanted everyone to leave her alone" and indicated that he wished to file a harassment report against Modongo for his repeatedly calling to ask about the victim's whereabouts, the police could have reasonably believed that the defendant exhibited a suspicious desire to detract attention from himself. We conclude that these facts in the search warrant affidavit, together with the reasonable inferences that could be drawn therefrom, established a fair probability that the defendant was involved in the victim's murder. Because the defendant was known to possess a particular cell phone and he had relevant communications with both the victim and Modongo via that cell phone, there was probable cause that the defendant's cell phone records would contain evidence of the victim's murder.[11] See, e.g., *State* v. *Evans*, supra, 352 Conn. 819.

Next, the defendant contends that the warrant fails for lack of particularity because it permitted the search and seizure of five weeks of his cell phone records, without demonstrating how each record during that time period was relevant to the murder investigation. We disagree. As we explain hereinafter, the warrant at issue satisfies the particularity requirement because it sought a list of specific records, over a relevant time frame, that

---

[11] Because we conclude that probable cause existed for all of the requested cell phone records, we need not address the state's argument that the defendant had a reasonable expectation of privacy only in his location data and not in the remaining records enumerated in the warrant.

was sufficiently limited and connected to the factual circumstances surrounding the victim's murder. Cf., e.g., *State* v. *Smith*, supra, 344 Conn. 251–52, 258.[12]

First, the warrant provided a sufficiently limited list of the specific records to be searched. The warrant requested records associated with the defendant's cell phone number and enumerated the categories of records sought, including "subscriber information, call detail records with cell site information, IP addresses for VoIP calls, voice records, data records with cell site information, SMS detail records, historical GPS locations . . . [as well as] precision location data and TDOA or Timing Advance Information . . . ." Each of these records was related to the murder investigation and the probable cause justifying the search. The subscriber information would confirm that the defendant was the T-Mobile subscriber. The records of the defendant's calls and messages were relevant to questions about his communications with the

---

[12] In *State* v. *Smith*, supra, 344 Conn. 229, we reviewed the constitutionality of two warrants: one seeking the contents of a cell phone, and one seeking cell phone records. See id., 233–34, 239–40.

We observed that, to be sufficiently limited, a warrant for the contents of a cell phone should "list [the] types of data [the] particular device or cell phones in general contain, and the types of data on the phone the affiants sought to search and seize, such as cell phone call logs, text messages, voice messages, photographs, videos, communications via social media, or other evidence of the crime[s]" for which the police have probable cause. Id., 251–52. Further, the scope of the search must be restricted "by a time frame reasonably related to the crimes." Id., 252. Accordingly, we concluded that a warrant for the contents of the defendant's cell phone was not sufficiently particular when it authorized a search of " 'data extraction' " with no time parameters. Id., 251–52.

Although we concluded that the warrant for the defendant's cell phone records was invalid for lack of probable cause; id., 257; we noted that the warrant was "more likely to satisfy the . . . particularity requirement." Id., 258. The warrant listed the items to be searched and seized as "SMS text messages, [email] information and messages, social media messages, video recordings, digital images, voice mail recordings, GPS data, [g]eolocator, and any other data/information stored on the [device], [i]nternal memory or removable storage media, and/or any data the [device] has access to through a cellular [n]etwork/[Wi-Fi]/Bluetooth connection." (Internal quotation marks omitted.) Id. Further, the scope of the search was limited by an eighteen day time frame "reasonably connected to the [crimes]" because the "dates correlate[d] to approximately one day before [the first crime was committed] up until the date the defendant was arrested." Id.

victim and Modongo, including whether he had a phone conversation with the victim after July 11, 2020. The remaining location information was relevant to establishing whether and when the defendant had traveled to the victim's apartment and Black Rock State Park, where the victim's remains were discovered.

Given the circumstances of the murder investigation, the time period for which the police requested the defendant's cell phone records was sufficiently limited. The defendant argues that, because the warrant sought records covering several weeks after the victim disappeared, it failed to adequately cabin the scope of the search. We disagree because "the constitutionality of [the police officers'] conduct [must be judged] in light of the information available to them at the time they [obtained the warrant]." *Maryland* v. *Garrison*, 480 U.S. 79, 85, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987). At the time the police applied for and obtained the warrant, on September 21, 2020, the police had insufficient information to identify a precise time frame during which the murder may have occurred. Essentially, the police knew only that the murder happened sometime between July 10, 2020, when the victim was last seen, and September 12, 2020, when the victim's remains were discovered. Because the state of the victim's remains suggested that the murder occurred well before September 12, 2020, it was reasonable for the police to request records up until August 14, 2020, which was about one month before her body was found and the day that her roommate reported that she was still missing. Therefore, given the available information, the warrant's time frame from July 10 to August 14, 2020, was sufficient to cabin the scope of the search.

The defendant contends that the warrant authorized a general search of all of his cell phone records due to its use of the phrase "including, but not limited to . . . ." The state responds that the use of this phrase merely reflects the reality that the police may not know exactly where digital evidence may be found. In *State* v. *Correa*, 353 Conn. 338, 341 A.3d 910 (2025), we reviewed a warrant

that authorized a search for "all data contained [in the defendant's cell phone] . . . including, but not limited to," certain listed items and that did not include any time parameters to limit the search. (Internal quotation marks omitted.) Id., 363–64. We concluded that the warrant was not particular because, like the warrant seeking the contents of a cell phone in *State* v. *Smith*, supra, 344 Conn. 251–52, "the warrant effectively authorized a search of the entire contents of the cell phone, regardless of the type of information or the date the information was created or received." (Internal quotation marks omitted.) *State* v. *Correa*, supra, 364.

Here, by contrast, the warrant authorized a search of only the defendant's cell phone records that were in T-Mobile's possession and were created within a limited time period. It did not allow the police to access all data contained within the cell phone, like the warrants in *State* v. *Correa*, supra, 353 Conn. 363–64, and *State* v. *Smith*, supra, 344 Conn. 251–52. For these reasons, we conclude that the "including, but not limited to" phrase did not render the warrant unparticular. See, e.g., *State* v. *Correa*, supra, 365 ("even if the police have difficulty knowing in advance where certain content may be located in a phone, providing reasonably tailored limits on the time and types of information that the police can search in the warrant application may help the state avoid constitutional infirmities").

Because the warrant was supported by probable cause and was sufficiently limited, we conclude that it was constitutionally valid. Therefore, the trial court properly denied the defendant's motion to suppress his cell phone records.

The judgment is affirmed.

In this opinion ALEXANDER, DANNEHY and BRIGHT, Js., concurred.